NOTICE

Decision filed 03/29/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200287-U

NO. 5-20-0287

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* M.R. and N.R., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Bond County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-JA-7 |
| | ) | |
| Courtney C., | ) | Honorable |
| | ) | Ronald R. Slemer, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's finding that the respondent mother was unfit is affirmed where the State proved that she was unfit by clear and convincing evidence. The court's best-interest determination was also not against the manifest weight of the evidence.

¶ 2    The respondent mother, Courtney C., appeals the judgment of the circuit court of Bond County terminating her parental rights to her minor children, M.R. and N.R.  On appeal, Courtney C. argues that the court's findings that she was an unfit parent under sections 1(D)(m)(i) and (ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2018)) were erroneous because the State failed to prove her unfit by clear and convincing

1

evidence. Courtney C. also argues that the court's finding that termination of her parental rights was in the best interests of M.R. and N.R. is against the manifest weight of the evidence. For the reasons that follow, we affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4     M.R. was born on March 7, 2012, to Courtney C. and Michael R. Thereafter, N.R. was born to Courtney C. and Michael R. on November 5, 2014. Courtney C. and Michael R. were divorced in September 2016. In March 2017, Courtney C. married Joseph C. while he was incarcerated on a child pornography charge. In January 2019, Courtney C. gave birth to B.C., who was Joseph C.'s daughter. This appeal involves the termination of Courtney C.'s parental rights to M.R. and N.R. However, facts relating to Michael R., Joseph C., and B.C. will be discussed as necessary to provide relevant background for the issues presented by this appeal.

¶ 5     On April 26, 2018, the State filed a juvenile petition, asserting that M.R. and N.R. were neglected and abused. The petition first alleged that the minors were neglected because their environment was injurious to their welfare, in that there were ongoing concerns about Courtney C.'s ability or unwillingness to protect them. The petition also alleged that the minors were neglected because they were not receiving the care necessary for their well-being, including adequate food, clothing, and shelter, in that Michael R. had

---

[1]This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). With respect to such cases, Rule 311(a)(5) provides in relevant part that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). In this case, the 150-day period to issue a decision expired on February 16, 2021. However, both parties were granted extensions of time to file their briefs. As a result, briefing in this appeal was not completed until March 18, 2021, and the case was submitted March 24, 2021. Under these circumstances, we find good cause to issue our decision after the 150-day deadline.

unstable housing and was not capable of having the minors reside with him. The petition further alleged that the minors were abused because Courtney C. created a substantial risk of physical harm and/or emotional impairment to them because she was unable or unwilling to make viable parenting decisions. Additionally, the petition alleged that the minors were abused because Courtney C. created a substantial risk of physical injury to them by other than accidental means that would likely cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function. It was alleged that Courtney C. was married to and resided with a sexual predator whose parental rights to his biological children had been involuntarily terminated and who was unable to obtain parental fitness, and that she allowed her husband, Joseph C., unfettered access to the minors even after M.R. disclosed that he inappropriately touched N.R.

¶ 6     Also on April 26, 2018, the trial court entered a temporary custody order, finding that there was an immediate and urgent necessity to remove M.R. and N.R. from their parents' care and that leaving M.R. and N.R. in their home was against their health, welfare, and safety. The court found that there was probable cause for the filing of the petition because Courtney C. failed to protect the children based on M.R.'s disclosure that Joseph C. had inappropriately touched N.R., and she allowed a sexual predator to have access to the children. These findings were based on a stipulation from Michael R., evidence that Courtney C. continued to allow Joseph C. to have access to the minors, and unsuccessful attempts by the Illinois Department of Children and Family Services (DCFS) to provide open intact services that failed to maintain the safety of the children. Thus, temporary custody of M.R. and N.R. was placed with DCFS.

¶ 7     On May 21, 2018, DCFS prepared an initial report and family service plan, which explained the reasons why the case was opened.  DCFS received a hotline call in March 2018 stating that Joseph C. was a registered sex offender who lived with Courtney C. and her children.  Courtney C. did not think it was an issue for the children to be around Joseph C.  Another hotline call was received in April 2018, in which the caller said Joseph C. was on school district property with Courtney C. while dropping the children off for school.  The report further indicated that there was a risk of sexual abuse to the children and of parental criminal behavior.  Giving rise to the sexual abuse risk finding, the report indicated that M.R. and N.R. had both disclosed that Joseph C. stuck his fingers in N.R.'s buttocks.  Courtney C. denied the allegation.

¶ 8     The services recommended for Courtney C. were to complete a parenting program, comply with any recommended services, and demonstrate appropriate parenting skills.  For Michael R., the services recommended were to complete a substance abuse assessment and comply with any recommended services.  Further, the services identified for Joseph C. were to complete a sexual perpetration evaluation and comply with any recommended services.

¶ 9     On May 25, 2018, a default adjudicatory order was entered against Michael R. after he was served with a summons and failed to appear.  In the order, the trial court found that the minors were neglected, and that they were in an environment that was injurious to their welfare as defined by section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)).

4

¶ 10   On June 20, 2018, Caritas Family Solutions (Caritas) filed an adjudication hearing report, which indicated that an integrated assessment had been completed on June 4, 2018. Courtney C. had been recommended to attend a parenting program, offense risk education and safety planning, and individual therapy.  Michael R. had been recommended to attend a substance abuse evaluation and individual counseling.  Joseph C. had been recommended to attend a sexual perpetration evaluation.  The children had also been referred to therapy.

¶ 11   The DCFS integrated assessment reported that Courtney C. was cordial throughout her interview.  Courtney C. disclosed that after her parents divorced when she was four years old, her stepfather was verbally abusive to her mother, which resulted in Courtney C. residing with her father.  Two of her maternal siblings were physically abused by her mother's ex-husband.  Courtney C. described her time in the Army as well as her relationship with Michael R.  Courtney C. married Joseph C. in March 2017, while he was incarcerated for child pornography.  She described their relationship as "good," she loved Joseph C., and she did not believe that he would harm her children.  Courtney C. also indicated that she believed Joseph C. was innocent of the child pornography charge.

¶ 12   The integrated assessment also listed the following concerns as to Courtney C.'s ability to meet the children's needs: supervision, medical management, discipline, and understanding impact of behavior.  Courtney C. chose to marry Joseph C. after he was convicted of child pornography and then moved him into her home after he was released from jail.  Joseph C. was only in the home for four days before the alleged digital penetration of N.R. occurred.  Courtney C. continued to deny the allegations even though she was aware of the incident and the children had been consistent in their accounts.

5

Courtney C. denied that Joseph C. presented a danger to the children and viewed the concern about him as unwarranted.

¶ 13   The integrated assessment revealed that Courtney C. reported she had little support, which left her feeling lonely.  Courtney C. "presented with emotional blunting, which may be rooted in depression."  The interviewer found her to be "somewhat numb" to the traumas she had experienced as well as to the DCFS case.  Courtney C. was in denial about Joseph C., and her ability to adequately parent was significantly impaired by her refusal to acknowledge his history as a sexual perpetrator along with her prioritization of their relationship over the children's safety and well-being.  Based on the foregoing, the assessment recommended offense risk education and safety planning, individual psychotherapy, involvement in children's services, obtaining Courtney C.'s past mental health treatment records, and coaching visitation.

¶ 14   On July 10, 2018, a DCFS family service plan was prepared, which identified the following services for Courtney C.: (1) complete an offense risk and safety planning class and comply with all recommendations, (2) actively participate in individual therapy, and (3) complete a parenting program and comply with all recommendations.

¶ 15   On July 11, 2018, Caritas filed another adjudication hearing report, which indicated that the caseworker had given Courtney C. information about parenting classes and individual therapy providers.  Courtney C. also self-reported that she was nine weeks pregnant at that time, presumably with Joseph C.'s child.  Joseph C. had not engaged in any recommended services, but services were unavailable to him because he was incarcerated at the Bond County jail.  Michael R. had also not engaged in any

recommended services. Caritas recommended that the children remain in DCFS custody, that Courtney C. and Michael R. have supervised visitation with the children, and that Joseph C. have no contact with the children.

¶ 16   On July 17, 2018, the trial court held an adjudicatory hearing as to Courtney C. and a dispositional hearing as to Michael R. After the hearing, the court found the minors were neglected in that they were in an environment that was injurious to their welfare as defined by section 2-3(1)(b) of the Juvenile Court Act (*id.*), and they were in substantial risk of physical abuse as defined by section 2-3(2)(ii) of the Juvenile Court Act (*id.* § 2-3(2)(ii)). The finding was based on the children's disclosure of sexual abuse as well as Courtney C.'s actions in marrying a sexual predator and allowing him access to the children.

¶ 17   On August 7, 2018, Caritas filed another adjudication hearing report, which indicated that Courtney C. was engaged in individual therapy at that time. The caseworker had provided Courtney C. with service provider information for the parenting program, but the worker had not provided service provider information for the offense education and safety planning classes because she was unable to locate one near Greenville. Neither Joseph C. nor Michael R. had engaged in services at that time. Courtney C. had supervised visits with the children for two hours per week in her home or in the community.

¶ 18   On August 13, 2018, the trial court held a dispositional hearing. According to the court's docket entry, it heard testimony from the caseworker as well as Courtney C., followed by arguments from the parties. After the hearing, the court entered a written dispositional order, finding that Courtney C. and Michael R. were unfit, unable, and unwilling to care for, protect, train, educate, supervise, or discipline M.R. and N.R., and

7

that placement with Courtney C. and Michael R. was contrary to the children's health, safety, and best interests. The court reached this conclusion because Michael R. had not yet started his service plan tasks and did not have appropriate housing, and because Courtney C. continued to maintain that Joseph C. did not molest her child, which posed a risk to the children. The court noted that reasonable efforts and appropriate services aimed at family reunification had been made, but they did not eliminate the necessity of removal of the minors from the home. The court again determined that M.R. and N.R. were abused and neglected, and it placed custody and guardianship with DCFS. The goal of the service plan was to return the children to their home within 12 months, and the parents were granted supervised visitation with the minors.

¶ 19    On October 29, 2018, Caritas filed a permanency hearing report, which stated that the children had been placed with a relative, they were doing well in their home, and their caregiver was committed to continuing to care for them as long as necessary. As to service plan progress, the report indicated that the caseworker was collaborating with Courtney C.'s therapist to get Courtney C. to complete a perpetrator education class. Courtney C. was attending parenting classes once per week. Neither Joseph C. nor Michael R. were engaged in services at that time. Courtney C. and Michael R. had supervised visits with the children.

¶ 20    At the November 2, 2018, permanency hearing, there was a stipulation concerning the lack of progress being made by Courtney C. and Michael R. That same day, the trial court entered a written permanency order, finding that neither parent had made reasonable progress or reasonable efforts toward the minors returning home in that Courtney C. needed

8

to continue engaging in services and Michael R. was not engaged in any services. The permanency goal was to return the children home within 12 months.

¶ 21	On January 23, 2019, Caritas filed another permanency hearing report, which indicated that the children were doing "very well" in their home. The caseworker had completed the referral for Courtney C.'s specialty class for offense risk education and safety planning. Courtney C.'s therapist indicated that Courtney C. was making adequate progress in her individual therapy. Courtney C.'s parenting classes were going well, and it was reported that she showed positive progress in the class. Joseph C. was not engaged in any services at that time. Michael R. had met with the caseworker to complete his substance abuse assessment, and he attended a drug screen. The report also indicated that Courtney C. and Michael R. were visiting the children during their scheduled times and were appropriate during their visits.

¶ 22	On February 6, 2019, the trial court held a permanency hearing, at which there was another stipulation concerning the permanency review. The court noted that Courtney C. had not made reasonable efforts or reasonable progress, although the agency had provided reasonable services and efforts. That same day, the court entered a written permanency order, finding that neither parent had made reasonable progress or efforts toward M.R. and N.R.'s return home as Courtney C. needed to participate in services contained in the service plan, and Michael R. needed to obtain a substance abuse evaluation and stable housing. The permanency goal remained to return the children home within 12 months.

¶ 23	On May 24, 2019, Caritas filed a permanency hearing report, in which it changed the recommended permanency goal to substitute care pending termination. The report

indicated that Courtney C. had completed her parenting education program. Due to a lack of available services related to the recommended offense risk education and safety planning class, Courtney C. had been working with her therapist on these issues, as the therapist had an extensive background in sexual abuse therapy and victimization training. The therapist reported that Courtney C. still lacked the understanding that Joseph C. could be harmful to her children. To the caseworker's knowledge, Courtney C. was "still denying any acts against her children." Courtney C. was attending weekly therapy and continued to maintain a home and job for the children. The report also indicated that Joseph C. had not completed a sexual perpetration evaluation. Michael R. was not engaged in services and had not completed his substance abuse evaluation.

¶ 24 It was further reported in the status report that Courtney C. had supervised visits with the children. The children's caregiver had offered Courtney C. additional visitations, but she had not taken advantage of this. Courtney C. and Joseph C. reported that they were divorced; however, they also indicated that they intended to be together regardless of the legality of their relationship. Courtney C. did not recognize the risk of harm to her children from Joseph C., who had several outbursts in which he made threats against Courtney C., the caseworker, and the foster parent for his youngest daughter. Joseph C. made statements while at two DCFS offices that warranted the security team contacting the caseworker about the safety of those involved. Joseph C. claimed that the allegations against him were false. Finally, it was reported that Michael R. was sporadic with his visitations with the children.

¶ 25    On July 31, 2019, the trial court held a permanency hearing, at which the following testimony was presented. Tiffany Kimmel, a lead foster care case manager for Caritas, had been assigned to M.R. and N.R.'s case in November 2018 after another caseworker stepped down from the case. Kimmel testified that she was requesting a permanency goal change to "Substitute care and pending termination" because Courtney C. was not showing progress as far as parenting her children consistently and correcting the conditions that brought the children into care. Kimmel explained that Courtney C.'s then-current status was that she was visiting with the children and attending services, but she had not shown any progress in her visitations with the children. Courtney C. was attending counseling, but she was not capable of applying what she learned in counseling to her day-to-day interactions with the children.

¶ 26    When asked for her understanding as to why M.R. and N.R. came into DCFS care, Kimmel explained that they were in the same home environment and were accessible to a sexual perpetrator, *i.e.*, Joseph C., who was Courtney C.'s husband. Joseph C. was a part of the DCFS family service plan, and he had been instructed to complete a sexual offender class. At the time of the hearing, he had not completed the sexual offender class, which was his only recommended service. Kimmel further testified that throughout the life of the case, the services recommended for Courtney C. and Joseph C. had remained the same, and neither of them had made progress. Kimmel again asserted that Courtney C. had not corrected the conditions that led to the children's removal from her home.

¶ 27    On cross-examination, Kimmel listed the services Courtney C. had been assigned to complete, which included parenting classes, individual counseling, and sexual

11

perpetration education class. Caritas could not locate a provider of the sexual perpetration education class in Courtney C.'s area, so Courtney C. was working with her therapist on those issues. Courtney C. had completed her parenting classes. She had also been consistently attending her individual counseling, but she was not making progress or understanding the effect that her relationship with Joseph C. would have on her children. Kimmel recalled that Courtney C.'s therapy progress reports and conversations with the therapist had been consistent in that Courtney C. was not making substantial progress during her visitations.

¶ 28 Kimmel testified that Courtney C. said she had filed for divorce, but that would not rectify the situation because she was still in a relationship with Joseph C., they were still living together, and they were together a substantial amount of the time. Kimmel considered that to be inappropriate because Joseph C. was a registered sex offender who had been accused of inappropriately touching Courtney C.'s children, but she continued to allow him to be around them. Kimmel stated that Courtney C. visited the children regularly, and the visits were mostly appropriate. There were no complaints about Courtney C. interacting with her children, she seemed to get along with them, and they seemed to love and interact with her. Kimmel believed that Courtney C. understood the restrictions that Joseph C. was not to have contact with the children, but she did not believe that Courtney C. was committed to that. Kimmel had repeatedly explained to Courtney C. that her relationship with Joseph C. was the biggest concern in this case, but Courtney C. did not understand the effect of Joseph C.'s presence on her children. Although Courtney C. had fulfilled aspects of her service plan, Kimmel remained concerned that Courtney C.

was not making progress in her understanding of what the problem was with Joseph C. or getting rid of him. Kimmel believed that the best thing for the safety of the children would be for Courtney C. to remove Joseph C. from her life, and Kimmel could not see Courtney C. being successful in any other way. Kimmel had discussed these issues openly and honestly with Courtney C. and encouraged her to work on her services. Kimmel explained that her view on Courtney C.'s progress was based on her observations during visitations, her interactions with Courtney C., and reports from her therapists as well as other people who were supervising Courtney C.'s visits with her children. Kimmel did not believe Courtney C. had made progress in being able to protect her children.

¶ 29 Courtney C. testified that she married Joseph C. in March 2017 while he was in prison. At the time of the hearing, she had filed for divorce, but it was dismissed because she could not pay the filing fee. She was still living with Joseph C. in Taylorville, but he had plans to move out. Courtney C. understood that Joseph C. was to have no contact with M.R. and N.R. Courtney C. said she understood that Joseph C. was a sex offender, there were allegations of sexual penetration with N.R., and why the children were removed from her home. Courtney C. did not believe the allegations against Joseph C. Rather, she claimed that her daughter said her paternal grandmother, who was also the children's foster parent, told her to fabricate the allegation. Courtney C. asserted she "was there the whole time with [her] kids" and had "heard three different stories about that night and none of them make sense." Courtney C. testified that she would never allow Joseph C. around her children because she understood that he was not allowed around them. Even if the court order were lifted, Courtney C. claimed she would seek DCFS approval prior to allowing

Joseph C. around the children. Courtney C. testified that under different circumstances, she would feel safe with her children being around him.

¶ 30 On cross-examination, Courtney C. admitted that Joseph C. went to prison after pleading guilty to child pornography. She also admitted that she chose to marry a sexual predator while he was in prison for child pornography, and he came to live at her house after he was released from prison. Joseph C. was released from prison on May 19, and the allegations of his digital penetration of N.R. happened within four days. N.R. disclosed the incident to numerous people, and the caseworker told Courtney C. that N.R. had been consistent in her disclosure. Courtney C. admitted that her divorce to Joseph C. had not yet been filed, he was still living with her, and his mother came with her to court that day. Courtney C. did not believe that Joseph C. was a danger to her children in that she had "not seen him do anything dangerous towards" her or her children. Courtney C. knew Joseph C. had a history of domestic violence and had violated prior orders of protection.

¶ 31 Courtney C. testified that if she believed that Joseph C. had done anything sexually inappropriate to her children, she would have turned him in and would not allow him around the children. However, she said she would have to see something inappropriate to know that it happened. Because Joseph C. was never allowed to be alone with the children, because of what N.R. allegedly told her, and because she did not hear N.R. scream from the next room, she did not believe the allegation. During arguments, the State requested that the permanency goal be changed to substitute care pending termination of parental rights. The guardian *ad litem* (GAL) agreed with the recommended goal change. The trial

court found that Courtney C. had not made reasonable efforts or reasonable progress. Thus, the court allowed the goal change.

¶ 32 That same day, the trial court entered another written permanency order, finding that neither parent had made reasonable progress or efforts toward M.R. and N.R.'s return home in that Courtney C. was not making reasonable progress on her service plan tasks, and Michael R. was not participating in services. The permanency goal was changed to substitute care pending termination of parental rights. The court found this goal was appropriate because M.R. and N.R. had been in the care of DCFS for more than one year, and their parents were not making reasonable progress or efforts.

¶ 33 On October 29, 2019, Caritas filed a permanency hearing report, which indicated that M.R. and N.R. were still doing well in their home and their caregiver was still committed to caring for them as long as it was needed. As to Courtney C.'s service plan progress, it was reported that she had started recording her visitations and any conversations about this case for "her protection." Courtney C. had been sporadic in her visitations with her youngest child, and her communications with the children's foster parent had deteriorated. Courtney C. requested that her visitation with the children take place with Joseph C.'s mother supervising, and this request was denied. Courtney C. was told she could bring Joseph C.'s mother along to her visits if it made her more comfortable, but she turned down this offer. After Courtney C. again expressed concerns about having her visitations at the foster parent's home, it was offered that they could take place at the foster parent's sister's home, but Courtney C. refused this as well.

15

¶ 34   The report further indicated that Joseph C. was arrested on June 24, 2019. Joseph C. had begun his recommended services but was "minimally engaged" and had not completed any of his homework assignments. Michael R. was not engaged in services at that time. Courtney C. had been attending supervised visits with the children. Courtney C. and Joseph C. reported that they had not filed for divorce due to financial problems; however, the caseworker repeated that the couple intended to stay together even if they were divorced. Courtney C. still did not recognize the risk of harm to her children from Joseph C. It was further noted that Joseph C. had several outbursts in which he made threats against Courtney C., the caseworker, and the foster parent of his youngest daughter.

¶ 35   On November 13, 2019, the trial court held another permanency hearing. Michael R. signed and submitted a voluntary consent to the termination of his parental rights and to the adoption of M.R. and N.R. Upon inquiry, the court accepted the voluntary consent. A permanency review order was entered pursuant to stipulation. The court found that Courtney C. had not engaged in reasonable services or reasonable progress, and custody and guardianship were to remain with DCFS.

¶ 36   Also, on November 13, 2019, the trial court entered another written permanency order, finding that Michael R. had voluntarily surrendered his rights, and that Courtney C. had not made reasonable progress toward the children's return home as she was attending services, but she had not made progress. The permanency goal remained substitute care pending termination of parental rights.

¶ 37   On January 10, 2020, Caritas filed a permanency hearing report, which indicated Courtney C. was being uncooperative in the planning of a visitation schedule that

16

accommodated her children rather than herself. During an incident on December 23, 2019, Courtney C. made a threat during her visitation with her youngest child that she was "going to go to Tiffany's [(the caseworker's)] house in the middle of the night and kill her in her sleep." This threat was reported to Courtney C.'s therapist and the authorities. This caused concern about her mental health and stability.

¶ 38   Also, according to the report, Joseph C. was arrested on January 6, 2020, and on that date, Courtney C. told him "that she was on her way home and would tell the police he was not present." This was heard by a worker who was supervising visitation between Joseph C. and his daughter. Joseph C. also requested that the caseworker present lie to the police and say he was not at home. The worker refused to do so and became fearful. Courtney C. claimed during this incident that things in her home were broken and her youngest child was screaming and scared, while the worker reported that the baby was not upset but was laughing and playful throughout. It was reported that Courtney C. "continue[d] to show signs of an altered sense of reality."

¶ 39   Since December 18, 2019, Joseph C. had repeatedly threatened the caseworker and said he would sue the agency and worker. Courtney C. and Joseph C. were still together, and Courtney C. did not recognize the risk of harm to her children from Joseph C. In addition to prior threats and incidents, the report indicated that Joseph C. informed the caseworker that he contacted KMOV4 and they were going to report on his innocence. Joseph C. requested copies of the children's interviews that were completed through the child advocacy center (CAC). When refused, Joseph C. and Courtney C. threatened to sue

17

and expose DCFS and the courts for "wrongdoings" and to prove their "innocence." A record of Joseph C.'s conversations with Caritas staff was attached to the status report.

¶ 40 On January 15, 2020, the State filed a petition for termination of parental rights and for appointment of a guardian with power to consent to adoption against Courtney C. The petition alleged that Courtney C. was unfit to have M.R. and N.R. under section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2018)) in that she failed to make reasonable efforts to correct the conditions that were the basis for their removal during two nine-month periods after the adjudication of neglect and under section 1(D)(m)(ii) of the Adoption Act (*id*. § 1(D)(m)(ii)) in that she failed to make reasonable progress toward their return during two nine-month periods after the adjudication of neglect. The State contended that it was in the children's best interests that Courtney C.'s rights be permanently terminated, and that M.R. and N.R. be placed in DCFS guardianship. The relevant time period was July 2018 through the date of the filing of the petition.

¶ 41 Prior to trial, four of the six DCFS family service plans completed in this case were filed with the trial court. The four service plans filed with the court were those completed by Kimmel; there had been two service plans prepared prior to Kimmel being assigned the case. The first was completed February 12, 2019, which indicated that Courtney C. was rated unsatisfactory for the services of completing a parenting program, following the recommendations of the parenting program, and demonstrating appropriate parenting skills during interactions with her children. She was also rated unsatisfactory for completing an offense risk and safety planning class and following its recommendations. Courtney C. was rated satisfactory for actively participating in individual therapy. Joseph C. was rated

18

unsatisfactory as to his service of completing a sexual perpetration evaluation and complying with its recommendations.

¶ 42 Another DCFS family service plan was completed on April 16, 2019, which indicated that Courtney C. was rated satisfactory for her services. However, as to desired outcome for Courtney C. to "attend offense risk education and safety planning classes to better understand the behaviors and dynamics of offenders and to understand the importance of protective planning," she was rated unsatisfactory because Kimmel did not believe that Courtney C. had "learned anything from this class nor has she made any efforts to understand the trauma" the children had suffered because of Joseph C. Joseph C. was rated unsatisfactory as to his service of completing a sexual perpetration evaluation and complying with its recommendations.

¶ 43 An additional DCFS family service plan was completed on October 10, 2019, which indicated that Courtney C. was rated satisfactory for completing a parenting program but unsatisfactory for following the recommendations of the parenting program and demonstrating appropriate parenting skills during interaction with her children. She was again rated satisfactory for participating in individual therapy. Courtney C. was rated unsatisfactory for completing an offense risk and safety planning class, but satisfactory for following the recommendations of the offense risk and safety planning class. Joseph C. was rated satisfactory for his services.

¶ 44 The final service plan was dated April 15, 2020, which indicated that Joseph C. was rated satisfactory for completing his sexual perpetration evaluation, but he was rated unsatisfactory for the service of following any and all recommendations of the sexual

19

perpetration evaluation. It was noted that Joseph C. had been incarcerated and had not completed services, and that he was not showing progress during his time in treatment.

¶ 45 Courtney C. was rated satisfactory for the service of completing a parenting program because she completed a parenting class. It was noted that she needed to continue to utilize the skills she learned in parenting classes during interactions with her children. As to the service of following "the recommendations of the parenting program and demonstrat[ing] appropriate parenting skills during interaction with her children," Courtney C. was rated unsatisfactory because she did not show parenting abilities during her visitations with her children. It was also reported that Courtney C. did not engage in parenting activities such as feeding, bathing, homework, or other engagement. Courtney C. was rated satisfactory on the service of actively participating in individual therapy. It was reported that she was still working with Jubilee House in Greenville. The last services related to sex offense risk and safety planning classes. As to the service of completing the class, Courtney C. was rated unsatisfactory because her counselor reported that she was not making adequate progress in addressing the concerns. The therapist reported the therapy being offered was not sufficient, as he believed Courtney C. was autistic. As to the service of following the recommendations of the offense risk and safety planning class, Courtney C. was rated satisfactory because she was working with her counselor on these issues.

¶ 46 On June 22, 2020, Caritas filed a status report, which indicated that Joseph C. was in prison, and that he was having "endless conversations" with Courtney C. but had "not reached out to [the case] worker in regard to the potential to complete services while incarcerated." It was further reported that Courtney C. remained with her husband despite

20

acknowledging the risk that he posed to her children. Courtney C. had started "placing blame of her behaviors and actions on a potential diagnosis of autism." However, the report stated that the likelihood of an autism diagnosis had been ruled out during a psychological evaluation. Courtney C. claimed she was not with Joseph C.; however, she continued to have phone contact with him as reported by the supervisors of Courtney C.'s visitations with her children.

¶ 47 The trial court held a fitness hearing on July 15, 2020, during which the following testimony was presented. Kimmel testified that when she was assigned to the case in November 2018, she reviewed the case file and had a transitional meeting with the previous caseworker and the supervisor on the case. She took those steps to get acquainted with the case prior to meeting with the family and to determine what services were already in place. Her understanding was that the minors came into DCFS care due to neglect from Courtney C. in that the children were exposed to a sexual perpetrator living in their home. The minors first came onto DCFS's radar after it was reported that N.R. had been sexually abused by Joseph C. During the CAC interview with the children, N.R. disclosed that Joseph C. stuck his finger in her behind; M.R. witnessed this and also disclosed that it happened. The reports were indicated, and in her review of the case file, Kimmel learned that Joseph C. had an extensive history with sexual abuse of children. Kimmel also learned that Courtney C. married Joseph C. in March 2017, while he was incarcerated for child pornography.

¶ 48 Kimmel testified that when a case was opened, the DCFS integrated assessment process was initiated. As part of this process, a clinical team through Southern Illinois

21

University in Carbondale would interview the parents, paramours, and the children. The clinical assessment identified barriers that could stand in the way of a family being reunited. DCFS then created a family service plan based off the needs and recommendations gathered as a part of the integrated assessment. The service plan outlined all the services being requested of the parent and the children prior to reunification. Kimmel testified that Courtney C.'s prognosis for reunification with her children was poor. The initial service plan in this case was completed by the previous caseworker. In total, there were six service plans completed for Courtney C., and the services listed in each plan remained the same.

¶ 49 According to Kimmel, the main issue preventing Courtney C. from being reunited with her children was her continued involvement with Joseph C. and that she allowed someone who could be a danger to M.R. and N.R. to be around them. Kimmel again testified about the circumstances giving rise to this case. Kimmel further stated that Courtney C. and Joseph C. have a daughter, B.C., born in January 2019. B.C. was in foster care at that time based on the same allegations against Courtney C. and Joseph C. that there was a risk of harm and that a sex offender had access to the child.

¶ 50 Kimmel was then questioned as to the specifics of the family services plans in this case. The services on Courtney C.'s service plan included parenting classes, individualized mental health therapy, and sex offense risk education. When asked if Courtney C. had been successful in her services, Kimmel responded in the negative. Courtney C. had completed her parenting classes, but her visitation with her children did not reflect that she had absorbed any information taught in those classes. She had attended therapy, but her

therapist indicated she had not made progress.  Kimmel believed that Courtney C.'s most important service was the sex offense risk therapy, which required classes on sexual abuse offenders and the risk of harm they could cause to children.

¶ 51    In July 2018, Courtney C. completed the 13-week parenting program through Lighthouse Pregnancy Center in Vandalia.  She was deemed to have successfully completed this service merely because she attended the classes.  Kimmel had observed Courtney C. with M.R. and N.R.; she typically played with them during her visits, but she did not do parenting activities such as cooking dinner, homework, or bath time.  She also focused on one child at a time, which was concerning if she were to have to divide her attention between her three children.  Courtney C. had consistently visited with the children throughout the case, with the supervised visitations beginning in her home.  Due to N.R.'s seizure disorder, it was hard for her to travel, as she experienced seizures during car rides.  Once the permanency goal was changed to substitute care pending termination of parental rights, the visits moved to the foster parent's home.  The foster parent, who was Michael R.'s mother, allowed Courtney C. extra visits with the children, and Courtney C. sometimes took advantage of the extra visits.  Kimmel testified that she did not see any improvement in Courtney C.'s parenting skills from the time she was initially assigned the case; Courtney C. had not been able to show that she had effective parenting skills.  Kimmel rated Courtney C. unsatisfactory on the parenting program service because she attended parenting classes but made no progress in improving her parenting skills.

¶ 52    Individualized mental health therapy was the second task on Courtney C.'s service plan.  Kimmel believed therapy was important for Courtney C. to process the trauma

involved with the children going into care and to get to the root of where the abuse or neglect originated to help her get past the barrier to the children returning home. This task was included on every service plan prepared in this case. Courtney C. was rated unsatisfactory on this task due to the fact she had made the effort to physically attend therapy but did not make any progress in therapy. Kimmel reviewed Courtney C.'s therapist's reports; Kimmel testified that there had never been a time where Courtney C. made progress and understood how she put her children at risk.

¶ 53 The third task on Courtney C.'s service plan was sex offense risk education. Courtney C. was engaged in sex offense education through her individual counselor. From the second service plan through the sixth service plan, Courtney C. was rated unsatisfactory for this task because she continued to involve herself with Joseph C. and allowed him contact with her children. Additionally, Kimmel believed that Courtney C. had not been honest with her. On multiple occasions, Courtney C. told Kimmel she was not with Joseph C. and that she was getting a divorce. At one point, Joseph C. was allegedly living in another home that he would not provide an address for. However, Kimmel verified that Courtney C. and Joseph C. were still together by driving by their home in Taylorville numerous times and seeing both of their vehicles. Further, Joseph C. "made it very clear" that he and Courtney C. were still together. Kimmel also verified that the couple was still married according to the Christian County circuit court. Courtney C. consistently reported that she did not believe that Joseph C. abused N.R., but instead thought the children's foster parent fabricated the allegation and convinced the children to report the abuse. That was concerning to Kimmel because if there was no acknowledgement that the abuse happened,

24

then there was "no way to begin to restore the relationship" or for Courtney C. to make progress in therapy or sex offender risk education. Kimmel testified that Courtney C. had never admitted that Joseph C. committed the abuse on N.R., and she did not acknowledge that he possessed child pornography.

¶ 54 Kimmel next testified that throughout the life of the case, she worked with Courtney C. to regain custody of her children, made referrals for her, and paid for services. Additionally, as a manner of oversight, Kimmel consulted with her supervisor about the case, and her supervisor approved the service plans Kimmel provided for Courtney C. She was also subject to administrative case reviews (ACRs), in which an independent organization reviews the private agency working with DCFS, as well as the cases the agency handles, every six months. The ACRs ensured that all DCFS standards were met, and that the agency was making referrals appropriately based on DCFS policy and procedure. During an ACR, Kimmel would rate parents on their service plan, and the ACR reviewer would look to see whether they agreed with the rating. There were four ACRs conducted in this case.

¶ 55 The first ACR took place on October 26, 2018, whereby all of Courtney C.'s services were rated unsatisfactory. At the ACR, the service plan was reviewed with the parents, and they discussed where the case stood. They reviewed the children's progress in school and therapies, and they reviewed the parent's progress in therapy and other services as well as the efforts the parent had expended on each of the services. Courtney C. would have been told at the ACR if she was unsatisfactory in her services. Courtney C.

25

was told of the "red flags" in her case at the first ACR, which was the sex offense risk education, and it was explained to Courtney C. why this was important.

¶ 56 The second ACR was held on April 24, 2019, at which time Courtney C. was encouraged to work on the services and advised that her parental rights could be terminated if she failed to work on the services. At that ACR, Joseph C. made threats against Courtney C. about telling DCFS what he wanted her to tell them; Joseph C. also threatened a security officer that was present. It was determined at the second ACR that Courtney C. had not made progress and was rated "unsatisfactory." The red flag at the second ACR was that Courtney C.'s services had not been completed. The ACR reviewer found that Kimmel was doing her job properly, that the services were appropriate, and agreed as to Courtney C.'s progress and rating.

¶ 57 The next ACR was October 24, 2019, and Courtney C. was rated unsatisfactory on all services. At that point, the ACR reviewer "was in agreement and requested that we file a legal screen." Kimmel testified that the legal screening process was a packet of information "regarding the parents' services, referrals, and efforts made in the case," which was then submitted to the DCFS legal team to review and determine whether the agency had done everything that they could as far as referrals and progress of the parents. During a legal screening, the agency asks DCFS to find that it is appropriate timing to file a petition to terminate parental rights. The legal screening on Courtney C.'s case, which was conducted 1½ years after the adjudication of neglect, was approved.

¶ 58 In December 2019, B.C.'s caregiver reported that Courtney C. threatened to kill Kimmel and her family in their sleep. Kimmel believed the threat to be credible and

notified her supervisor as well as the GAL. Joseph C. had also been arguing with Kimmel and B.C.'s caregiver about seeing B.C. on Christmas, and the caregiver indicated that she did not feel safe supervising the visits between him and B.C. This incident led to a deterioration between Joseph C., Courtney C., and Kimmel.

¶ 59 The final ACR took place in April 2020, during which Courtney C. was again rated unsatisfactory. The ACR reviewer found that Kimmel was correct in everything she had done in the case thus far. Kimmel testified that although Courtney C. had physically attended services, Kimmel had not seen any change in Courtney C. from the beginning of the case to the date of the fitness hearing. Kimmel believed that at the time of the hearing, Courtney C. was still maintaining a relationship with Joseph C., which she found concerning.

¶ 60 Kimmel was then asked whether there was anything else she wanted the trial court to know during the fitness portion of the hearing. Kimmel testified that Joseph C. was arrested in January 2020. When that arrest was occurring, a case assistant was present for a visitation between Joseph C. and B.C. When the police arrived at the house, Joseph C. asked the case assistant to lie and tell the police that he was not present. The case assistant communicated with Kimmel during the incident that she was worried, and Joseph C. was starting to get violent. He then called Courtney C., asked her to come home, and asked her to tell the police that he was not present. Courtney C. came home from work, but the police had already entered the house at that time.

¶ 61 At the time of the fitness hearing, Joseph C. was incarcerated on a parole or probation revocation. Kimmel believed that was the only reason that Courtney C. was not

with Joseph C. at that time. Although Joseph C. was not a part of this case, he was a paramour, so there were services he would have to complete in order for Courtney C. to be reunified with her children. Specifically, Joseph C. would have to complete a sex abuse perpetration evaluation and follow any recommended sex offender treatment. Joseph C. attended the evaluation but failed to complete any recommended services. Joseph C. had been openly hostile to Kimmel throughout the case and had threatened her. In the six years that she had been a caseworker, this was the first case in which one of her clients wanted to kill or hurt her. Kimmel also stated that Courtney C. "was very open to things" at the beginning of the case but that had deteriorated.

¶ 62  Kimmel testified that Courtney C. had a psychological evaluation in March 2020, and Kimmel's review of the psychological evaluation raised concerns. The psychologist, Dr. Frank Kosmicki, noted that Courtney C. presented as "fake good." Dr. Kosmicki further stated "that she was providing answers that she believed he wanted to hear rather than the truth of what was *** actually happening." This was consistent with what Kimmel witnessed throughout the case.

¶ 63  Allison Heater, Kimmel's supervisor, testified that she had been employed at Caritas since January 2018. Prior to that, she was a case manager at Lutheran Child and Family Services for about two years. Heater testified that as a supervisor, she reviewed integrated assessments and service plans. She also reviewed cases to ensure they were overall "headed in the right direction," meaning family reunification if possible or to seek permanency through adoption and guardianship if reunification was not possible. Heater had been involved with this case since it was transferred to Kimmel in the fall of 2018.

28

Heater tried to be involved with the initial meeting with the family if possible, which she did in this case. Heater found the main issue in this case to be Courtney C.'s failure to protect the children and Joseph C.'s history of being a sex offender.

¶ 64 During this case, Heater and Kimmel met on a monthly, if not weekly, basis regarding the case. Heater reviewed and agreed with the integrated assessment, the service plans, and all the services; she also agreed with the unsatisfactory ratings. She believed Kimmel had done her job in ensuring that the services were provided and in doing everything she could do reunite this family. Heater did not believe that Courtney C. could be reunited with the children at the time of the hearing because Joseph C. was still in the picture. Courtney C.'s psychological evaluation revealed information about her prior paramours and dependency traits, which suggested that even if Joseph C. were out of the picture, there would likely be a similar paramour in her future. Heater believed that her agency had done everything they could to provide services to Courtney C. Heater only met with Courtney C. once per typical procedure, and thus, her opinion was based on Kimmel's assessment as well as all the reports, documents, and the psychological evaluation she reviewed relating to the case. Heater reiterated that it was her standard operating procedure to rely on the caseworkers she supervised to give her accurate information. After Heater's testimony, the State rested its case.

¶ 65 Courtney C. testified that she resided in a two-bedroom home in Taylorville. Courtney C. believed that her children were removed from her care because of an allegation of sexual penetration between Joseph C. and her then three-year-old daughter, N.R. Courtney C. stated that she never saw "anything like that take place," and she was there

"the whole time with [her] children." She said she was present in the same room during the diaper change when the incident allegedly took place. She testified that Joseph C. never touched her daughters; she was the one who changed diapers and gave baths, and he was never around when she completed those tasks. She believed that the incident never happened, and her daughters were coached to say that it happened.

¶ 66    Courtney C. indicated that she had only been involved with two men (Michael R. and Joseph C.) as she had a hard time with social interactions. Courtney C. agreed that she was "more dependent" and would "generally go along with what a guy would do." After high school, she moved in with Michael R. and then she lived with Joseph C.; she never lived alone until Joseph C. moved out in September 2019. Courtney C. said she told caseworkers to come by her house and check that Joseph C. did not live there, but no one did. She testified that neither Michael R. nor Joseph C. were physically abusive, that Michael R. was verbally abusive, and that Joseph C. was controlling of her communication with Michael R. Her mother was in an abusive relationship, and she was never taught how to deal with that sort of situation. She was working with her counselor on those issues.

¶ 67    Courtney C. testified that she had been going to counseling since 2018; during that time, she learned of characteristics to look for to avoid men who might be abusive or a perpetrator. Courtney C. was aware Joseph C. had a substantial criminal history. She regretted marrying and continuing a relationship with Joseph C. She was still married to him, but their divorce was pending. Courtney C. would never leave him alone with her daughters because he wanted to raise B.C. to be like him. In the months leading up to the

fitness hearing, their contact was only by phone and about B.C. Courtney C. testified that she had only recently learned that she should have no communication with him at all.

¶ 68    On cross-examination, Courtney C. testified that she talked to Joseph C. on the phone usually twice per day. She admitted that on every call she told Joseph C. that she "love[d] him forever and always." When asked if they talked about what their life would look like after he got out of prison, she said that was only if he could "clear his name." She testified that she "ha[d] a love" for both Joseph C. and Michael R. because Michael R. gave her two daughters and Joseph C. gave her one. Courtney C. then rested her case.

¶ 69    The trial court heard arguments from counsel, and the GAL gave his recommendation, which was that the court find Courtney C. unfit as a parent for the reasons outlined in the petition. The GAL further asserted that this case was not about Joseph C., it was about Courtney C. and "her ability or inability to protect the minor children from the types of act that occurred." The GAL thought the allegations of what Joseph C. did to N.R. were "entirely foreseeable" when Courtney C. moved a sexual offender into her home. The trial court then announced its findings, stating, "It's unfortunate and I am totally shocked by the lack of progress that she has made." The court found Courtney C. had even "backslid" during the life of the case. The court continued, "It is very clear that she has not made reasonable efforts, has not made reasonable progress in either one of the time frames." Therefore, the court found that the State had proven, by clear and convincing evidence, that Courtney C. was unfit to have M.R. and N.R. under section 1(D)(m)(i) of the Adoption Act (*id*. § 1(D)(m)(i)) in that she failed to make reasonable efforts to correct the conditions that were the basis for the children's removal during any nine-month period

31

after the adjudication of neglect, and under section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)) in that she failed to make reasonable progress toward the children's return during any nine-month period after the adjudication of neglect.

¶ 70   On July 27, 2020, Caritas filed a best-interest report with the trial court, which indicated that Courtney C. always visited her children but did not always engage in parenting activities with them.  She often focused on one child at a time.  Courtney C. did not take advantage of additional visitation time offered by the children's foster parent.  It was further reported that N.R.'s seizures had greatly improved since she was removed from Courtney C.'s home.  M.R. was doing better in school and had increased her social and emotional skills.  M.R. and N.R. had been placed together with their paternal grandmother, they were thriving in their placement, and they were reaching their developmental targets.

¶ 71   The best-interest report also stated that the children were seeing a counselor, who believed they were doing "incredibly well" in their placement.  M.R. and N.R. were very close with their grandmother, who took the children to all of their appointments in addition to seeking unconventional treatments for N.R.'s seizures.  The report concluded by recommending that the children remain with their foster parent and that it would be detrimental to their well-being to be removed from their placement.

¶ 72   At the best-interest hearing on August 19, 2020, Kimmel testified that M.R. was eight years old and N.R. was five years old.  M.R. had been tested for autism but not officially diagnosed, and N.R. had a seizure disorder.  Kimmel found them to be "really good girls," who played well together and had wild imaginations.  Since 2018, the minors had been placed with their paternal grandmother, Donna File, who moved into a new home

to be an appropriate placement for the children. They lived in a second-story apartment with enough bedrooms for the children to have their own, but they shared a room because they liked it better that way. Kimmel visited the home three times per month. Kimmel had observed the children interact with File, and she testified that they looked to File as their grandmother but also as a parent; they hugged and doted over File. They also looked to her for direction and instruction. The children were safe in that placement.

¶ 73 Kimmel testified that M.R. and N.R. were able to develop their own identities in File's home. They had their own likes, she allowed them to pick their own favorite colors and movies, and they got to choose their own clothing and shoes to fit their personalities. There was extended family that M.R. and N.R. interacted with; they also had a relationship with their maternal grandmother. Kimmel believed that the minors had an attachment to File, they showed love to File, and File showed love to and always encouraged them. The children were comfortable in File's home. They also had ties to the local Greenville community. Both children had special needs; M.R. with autism and N.R. with her seizures, although the frequency of the seizures had reduced to less than one per week. They both had individualized education plans (IEPs) at school. File had taken on those issues. The children received the appropriate services at school, and File attended the IEP meetings. Kimmel testified that File was willing to provide permanency to the children, she had the resources to care for them, and she offered visitation to both parents. Kimmel said there was never an instant that made her question the children's placement with File.

¶ 74 On cross-examination, Kimmel testified that Courtney C. exercised her visitation rights, and the children were excited when she arrived at the residence. File continued to

allow weekly visits even after the goal changed to termination of Courtney C.'s parental rights, which Courtney C. took advantage of but did not take advantage of additional visitation time offered by File. Kimmel lastly testified that the minors loved Courtney C.

¶ 75    File testified that she resided in Greenville, she had been at her current residence for almost three years, and she chose the apartment because it was large enough for the children. She had been involved in M.R. and N.R.'s lives since birth. There was an approximate eight-month period when File lived with them and took care of M.R. while Courtney C. was in Afghanistan with the Army. After that, File was the minors' babysitter, she kept them every other weekend, and she generally saw them every day until their parents were divorced. During that time, there was no one, aside from the parents, who had more contact with the children than File. After the divorce, the minors were placed with different babysitters, so File did not see them.

¶ 76    When the children were first placed into care, they were placed with File's sister until File could find appropriate housing. File still saw the girls almost every day during that time. File testified that when the children were first placed with her, she had a difficult time with them due to misbehavior. It was hard to get the children to understand structure and discipline, but with time they thrived with structure. File testified that M.R. had autism, had difficulty understanding daily tasks, and had to be constantly reinforced. At the time of the hearing, M.R. had friends, which she did not have when she first moved in with File. M.R. had a difficult time in kindergarten prior to and in the beginning of her placement with File, but that changed, and she loved and did well in first grade. File was very proud of M.R.'s progress.   File testified that N.R. was doing wonderful in

34

kindergarten, and stubbornness was her only behavioral problem. N.R. had frequent seizures when she was first placed with File, at least 20 per day, but after getting the correct medication on a set schedule she only had one seizure per month. N.R. took her medication, was not as tired, and was able to learn, whereas prior to getting the seizures under control, she would be tired, sleep, and miss school.

¶ 77 File testified as to the activities she did with the children as well as vacations they had taken together. File also testified that she received help with the children from her sister, who was the foster parent of the children's eight-year-old cousin. In return, File would babysit the children's cousin, and they were all "really close." File referred to M.R. and N.R. as "her children" because she considered them her children, she loved them, and she was willing and capable of providing for them even with their special needs. Her family had welcomed the children as if they were File's own children. File continued to allow Michael R., who was her son and who signed directed consents to allow File to adopt the children, to see them and planned to continue that. File asked the children what they wanted in the future, and they indicated they were happy with the situation as it stood. As supervisor for Courtney C.'s visitation, File knew the minors loved their mother, but she did not see a mother-child bond; she believed that the children treated Courtney C. more like a big sister. File intended to continue offering Courtney C. visitation in the future. However, she testified that she would protect the children and their safety would be a top priority. After File testified, the State rested.

¶ 78 Courtney C. testified that since the fitness hearing, she had Joseph C. served with divorce papers and stopped all communications with him. Courtney C. testified that M.R.

35

was like her when she was a little girl. She further testified that N.R.'s seizures started when Courtney C. and Michael R. divorced. The seizures got worse, and N.R. was hospitalized for five days in 2017. Courtney C. struggled caring for her two children as a single mother because of her own issues, which her counselor believed were autistic traits. However, now that she had been to ongoing counseling, she believed that she could better handle the problems of being a single parent to two children. Courtney C. believed the minors went through a lot of stress during her divorce with Michael R., and she acknowledged that what the children went through at that time was her fault. Courtney C. loved her children, and they loved her. She obtained employment at the post office to support them. Courtney C. stated that she had a very strong bond with her children.

¶ 79    On cross-examination, Courtney C. admitted that she struggled in the past. Courtney C. testified that File and her family had been supportive, had always been there for the children, and had done a good job raising them. Courtney C. had seen a lot of improvement in the children. Courtney C. agreed that File loved the children like they were her own, and the children loved her back. File had done everything she could to keep Courtney C. as part of the children's lives, and the children were happy with File. After Courtney C. testified, she rested, and the trial court heard closing arguments. The GAL recommended that the court enter an order terminating Courtney C.'s parental rights.

¶ 80    In relevant part, the trial court stated:

> "Courtney, there's no doubt that you love those daughters. That's not enough. That's not enough. You know, I have no doubt that you love your children. *** They deserve more than that, Courtney. They deserve it, and that's why in this hearing it talks about what's called best interest, because I remember those hearings that I've done with you and the risks that you put those children at with [Joseph C.]

36

and how you defended him in all these hearings, and there's no doubt and I don't think there's any doubt in anyone in this room that [Joseph C.] was a terrible choice.

Courtney, I'm glad that you're receiving counseling. I hope you continue with it. I have no idea what-all you have gone through in your lifetime, but I want to do what I can that the—that your two daughters don't have the same experiences that you have and don't make the same choices that you have made, and I think that's in their best interests. And, you know, I still have to go back to the fitness hearing. I have to go back to every hearing that we've had in this case and think: Is it in the best interest for those children to be with Courtney, or is it in their best interest to terminate the parental rights of Courtney. *** Mr. Abell [(Courtney C.'s counsel)] eloquently said that you have made progress. There's no doubt in my mind that you have made progress. Unfortunately, I remember how you were in those early hearings and how you gave the chance, gave the opportunity for putting those two girls at risk."

The court then took the matter under advisement.

¶ 81 After the best-interest hearing, the trial court entered a written order terminating parental rights, finding that termination of Courtney C.'s parental rights was in M.R. and N.R.'s best interests. The court again found that the State proved by clear and convincing evidence that Courtney C. was unfit because she failed to make reasonable progress or efforts toward M.R. and N.R.'s return during two nine-month periods after an adjudication of neglect. On August 20, 2020, the court entered a permanency order, changing the permanency goal to adoption. Courtney C. filed her notice of appeal on September 17, 2020, and an amended notice of appeal on September 18, 2020.

¶ 82                                   II. ANALYSIS

¶ 83 Courtney C. initially argues that the trial court erred in finding her unfit under sections 1(D)(m)(i) and (ii) of the Adoption Act (*id.* §§ 1(D)(m)(i), (ii)) because the State failed to prove her unfit by clear and convincing evidence. She additionally contends that the court's best-interest determination was against the manifest weight of the evidence.

37

¶ 84                          A. Fitness Determination

¶ 85    Termination of parental rights proceedings are governed by the Juvenile Court Act

(705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/0.01 *et seq.*

(West 2018)).  *In re D.F.*, 201 Ill. 2d 476, 494 (2002).  A petition to terminate parental

rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step

process in seeking to terminate parental rights involuntarily.  705 ILCS 405/2-29(2) (West

2018).  The State must first establish, by clear and convincing evidence, that the parent is

an unfit person under one or more of the grounds of unfitness enumerated in section 1(D)

of the Adoption Act (750 ILCS 50/1(D) (West 2018)).  705 ILCS 405/2-29(2), (4) (West

2018); *In re D.F.*, 201 Ill. 2d at 494-95.  Because each of the statutory grounds of unfitness

is independent, the trial court's finding may be affirmed where the evidence supports a

finding of unfitness as to any one of the alleged grounds.  *In re C.W.*, 199 Ill. 2d 198, 217

(2002).

¶ 86    Our courts have recognized that parental rights and responsibilities are of deep

importance and should not be terminated lightly.  *In re K.B.*, 314 Ill. App. 3d 739, 748

(2000).  Thus, parental rights may be terminated only after a finding of unfitness that is

supported by clear and convincing evidence.  *In re Gwynne P.*, 346 Ill. App. 3d 584, 590

(2004).  A finding of unfitness will not be disturbed unless it is against the manifest weight

of the evidence.  *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004).  A finding is against the

manifest weight of the evidence only if the opposite conclusion is clearly apparent or the

determination is unreasonable, arbitrary, or not based on the evidence.  *In re D.F.*, 201 Ill.

2d at 498.  A trial court's finding of unfitness is given great deference because it has the

best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). A reviewing court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001).

¶ 87 Here, the trial court found Courtney C. unfit for the following two grounds: (1) under section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2018)), she failed to make reasonable efforts to correct the conditions that were the basis for M.R. and N.R.'s removal during any nine-month period after the adjudication of neglect, specifically between July 2018 through January 2020; and (2) under section 1(D)(m)(ii) of the Adoption Act (*id*. § 1(D)(m)(ii)), she failed to make reasonable progress toward M.R. and N.R.'s return during any nine-month period after the adjudication of neglect, specifically between July 2018 through January 2020.

¶ 88 Reasonable efforts and reasonable progress are two distinct grounds of unfitness under section 1(D)(m). *In re Daphnie E.*, 368 Ill. App. 3d at 1066. Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child and are judged by a subjective standard based upon the amount of effort that is reasonable for that particular parent. *In re R.L.*, 352 Ill. App. 3d at 998. The court must determine whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. In contrast, reasonable progress is judged using an objective standard that focuses on the steps the parent has taken toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. The standard by which progress is measured is the parent's

compliance with the court's directives and the service plans in light of the conditions that gave rise to removal and other conditions that later become known and would prevent the court from returning custody of the child to the parent. *Id*. "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 89 The State identified the two relevant 9-month periods for reasonable efforts and progress as the first 18 months immediately following the July 17, 2018, adjudication of neglect. As such, the relevant time periods were identified as July 2018 through April 2019 and April 2019 through January 2020. The trial court found that reasonable efforts or reasonable progress had not been made between the July 17, 2018, adjudication of neglect through January 2020, when the petition for termination of parental rights was filed.

¶ 90 The record reveals that the children were brought into care because Joseph C. was a registered sex offender who lived with Courtney C. and her children. It was also reported that there was a risk of sexual abuse to the children and of parental criminal behavior. Giving rise to the sexual abuse risk finding, the report indicated that M.R. and N.R. had both disclosed that Joseph C. stuck his fingers in N.R.'s buttocks. Courtney C. denied the allegation. Throughout the life of the case, Courtney C.'s service plan tasks were to (1) complete an offense risk and safety planning class and comply with all recommendations, (2) actively participate in individual therapy, and (3) complete a parenting program and comply with all recommendations. During the two nine-month periods after the July 2018 adjudication of neglect, Courtney C. physically attended

40

parenting classes, participated in therapy, and worked with her therapist on the sex offense risk and safety planning issues.

¶ 91    Nevertheless, the record reveals that Courtney C.'s visitations with her children did not reflect that she had absorbed any of the information taught in her parenting classes. When Kimmel observed Courtney C.'s visits with the children, Courtney C. typically played with them rather than completing parenting activities such as cooking dinner, homework, or bath time.  Courtney C. also focused on one child at a time, which was concerning if she were to have to parent and divide her attention between her three children. Kimmel testified at the fitness hearing that she had not seen an improvement in Courtney C.'s parenting skills and Courtney C. had not been able to show that she had effective parenting skills.  Similarly, Courtney C.'s therapist reported that she had not made progress in her individualized mental health therapy.  Upon review of Courtney C.'s therapist's reports, Kimmel testified that there had never been a time where Courtney C. made progress and understood how she put her children at risk.

¶ 92    As to her most important service of sex offense risk education, Courtney C. was repeatedly rated unsatisfactory for this task because she continued to involve herself with Joseph C. and allowed him contact with her children.  Kimmel also found Courtney C. to be dishonest about her involvement with Joseph C., with there being multiple occasions when Courtney C. told Kimmel she was not with him or that she was getting a divorce. Notwithstanding any efforts Courtney C. made to divorce Joseph C., she indicated to Kimmel that the two of them planned to stay together even if they were not legally married. Perhaps most indicative of Courtney C.'s lack of progress throughout the relevant time

frame, she consistently reported that she did not believe that Joseph C. abused N.R. and blamed the children's foster parent for the allegation. Courtney C. also failed to acknowledge that Joseph C. was guilty of possessing child pornography. Courtney C. admitted during the fitness hearing that she talked to Joseph C. twice per day although he was incarcerated, she told him she "love[d] him forever and always" on every phone call, and she denied the allegations against him.

¶ 93 Based on the evidence presented at the fitness hearing, Courtney C.'s failure to improve her parenting skills, and her failure to acknowledge the sexual abuse Joseph C. committed against N.R. as well as the risk he posed to the children, we agree with the trial court's conclusion that the State proved by clear and convincing evidence that Courtney C. was unfit in that she had not made reasonable efforts or progress during the two nine-month periods immediately following the adjudication of neglect.

¶ 94                     B. The Best-Interest Determination

¶ 95 If the court finds that the parent is unfit, the matter proceeds to a second hearing, at which the State must prove that termination of parental rights is in the best interests of the child. 705 ILCS 405/2-29(2) (West 2018); *In re D.F.*, 201 Ill. 2d at 495. Following a finding of parental unfitness, the focus shifts entirely to the child. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). At the best-interest stage, all considerations must yield to the best interest of the child, and the parent's interest in maintaining a parent-child relationship yields to the child's interest in a stable, loving home life. *Id.* At this point, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *Id.* at 366.

¶ 96 In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 52; see also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 97 Here, the trial court found that termination of Courtney C.'s parental rights was in M.R. and N.R.'s best interests. In so deciding, the court found that Courtney C. put the children at risk by staying with Joseph C. and that she repeatedly defended him during the hearings on this case. Although the court believed that Courtney C. loved the children, it found that was not enough, and the children deserved "more than that." We conclude that Courtney C. has not established that the court's best-interest finding was against the manifest weight of the evidence.

¶ 98 At the best-interest hearing, Kimmel testified that M.R. was eight years old and N.R. was five years old, they were "really good girls" who had been in care since 2018, and they had been placed with their paternal grandmother. The children were safe in that placement, and all their needs were being met. The children looked to their foster mother as a

43

grandparent but also a parent, they hugged and doted over her, and they looked to her for direction and instruction. The children were attached to their grandmother, and they were satisfied in their placement. The children were able to develop their own identities in File's home, and they had extended family they interacted with. File was taking the appropriate steps to improve the children's special needs, and they had both improved significantly since they had been in her care. The children had ties to the Greenville community and were doing well in school.

¶ 99   File was willing to provide permanency to the children, she had the resources to care for them, and she offered visitation to Courtney C. and Michael R. Although File intended to continue offering visitation to both parents, she understood the need to protect the children and their safety would be a priority. Although the children loved Courtney C. and were excited when she visited them, File thought they looked to Courtney C. more as an older sister rather than a parent. The best-interest report determined that it would be detrimental to the children's well-being to be removed from their placement with File. Kimmel said there was never an instant that made her question their placement with File.

¶ 100  Similarly, the GAL recommended that it was in the best interests of the children for Courtney C.'s parental rights be terminated, based in large part on File's testimony. The GAL noted that the children deserved permanence, that they had thrived with File, and that she offered them stability. He noted that the children had made progress "and they have to be able to continue to make that progress, and Mrs. File can give them that." The GAL found it "heart-wrenching" that File wanted the children to maintain some level of relationship with their natural parents so they would not be left wondering where that

44

relationship went. He noted that File could do that with boundaries and supervision that would allow the girls to be safe. Given the above evidence, we conclude that, after considering the statutory factors, the trial court's finding that it was in M.R. and N.R.'s best interests to terminate Courtney C.'s parental rights was not against the manifest weight of the evidence.

¶ 101                                    III. CONCLUSION

¶ 102 For the foregoing reasons, we affirm the judgment of the circuit court of Bond County.


¶ 103  Affirmed.